## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ROBERT BUSSARD and DANIEL GIBSON, on Behalf of Themselves and All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>BRYAN HEALTH<br><br>                    Defendant. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Robert Bussard and Plaintiff Daniel Gibson (collectively "Plaintiffs"), individually on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against the Defendant Bryan Health ("Defendant" or "Bryan"). The allegations in this Complaint are based upon the personal knowledge of Plaintiffs, and on information and belief as to all other matters through investigation of Plaintiffs' counsel.

### <u>NATURE OF THE ACTION</u>

1.      This putative class action is brought on behalf of all persons, users, prospective patients, and current patients who visited the Defendant's website https://www.bryanhealth.com/[1] (hereinafter, the "Website"), utilized the Website for its various intended purposes, and had their private health conditions, identities, actual or potential medical treatments, and the hospitals they visited or may visit disclosed to Meta Platforms Inc. ("Meta" or "Facebook") without their knowledge or consent (hereinafter, "Tracked").

---

[1] Plaintiffs note that Defendant's Website Privacy Notice references bryanhealth.org, instead of https://www.bryanhealth.com. The link to https://www.bryanhealth.org currently links to bryanhealth.com, and it does not appear that https://www.bryanhealth.org currently operates. Thus, Plaintiffs believe that Defendant's representations and Privacy Notices apply to users of the website its linked from, i.e. https://www.bryanhealth.com.

2.      Plaintiffs and the Class Members seek damages associated with Defendant's violation of their privacy rights under the Federal Wiretap Act 18 U.S.C. § 2510, et. seq. (the "Wiretap Act"); the Nebraska's Wiretap Act, Nebraska Revised Statutes §86-297; and common law claims for invasion of privacy, breach of contract, negligence, and intrusion upon seclusion.

3.      Defendant's "Website Privacy Notice" (the "Privacy Policy") informs Tracked Users that "[Bryan] will strive to maintain [Tracked Users'] privacy, confidentiality and security at all times" and that "[Bryan] will not use [Tracked Users'] information without [their] permission, unless for purposes of maintaining the site or for reviewing the site's use." Tracked User[2] Throughout Defendant's privacy notice, Bryan emphasizes the importance of keeping Tracked Users' confidential personal health information safe from unauthorized disclosure. The Notice of Privacy Practices also describes how Defendant may use and disclose information about Tracked Users to others outside Bryan, however, none of these notices indicate that Bryan will disclose private health information ("PHI") to Facebook, for Facebook's and Bryan's own use and monetary gain.[3] Rather, the Notice of Privacy Practices informs Tracked Users that Bryan "will not use or disclose [Tracked Users'] health information for marketing purposes without [their] authorization."[4]

4.      Since its creation in 2004, Facebook has evolved into a social media giant, which has allowed it to take advantage of its massive audience to become one of the largest advertising companies in the world.[5]

---

[2] *Website Privacy Notice*, BRYAN HEALTH, https://www.bryanhealth.com/privacy/ (last visited November 6, 2024).
[3] For example, Tracked Users may reveal health conditions, doctors they are seeking, illnesses, and family-planning status (*i.e.* pregnancy) by using the Website to search for a doctor or for information regarding their health conditions. *Id.*
[4] *Id.*
[5] *Facebook Ad Revenue (2017-2026)*, OBERLO https://www.oberlo.com/statistics/facebook-ad-revenue (last visited November 6, 2024).

5.      In order to optimize its advertising business, Meta collects data regarding users' interactions with websites across the internet. One of the ways Meta collects this user data is through its offering of the Meta Business Tools, including the Conversions API and the "Meta Pixel" (hereinafter the "Pixel").

6.      The Pixel is a snippet of computer code that  Defendant places on its Website and when a user visits the Website, the Pixel allows Defendant to collect the PHI of its users and share it with Facebook.[6]  Specifically, Defendant tracks users' activities on the Website by utilizing the Pixel, which intercepts the PHI of Tracked Users, such as the search terms used by a Tracked User on the Website, including the health condition the user is searching for,  the specific doctors that Tracked Users searches for, the area of expertise of the doctors that patients are seeking, and other information related to the Tracked User's use of the Website, along with the user's Facebook ID ("FID" or "UID"). The users' PHI and FID are packaged together and then sent via a single data transmission to Facebook, enabling Facebook to identify users and associate users' profiles to users' PHI. This occurs even when the Tracked User has not consented or authorized the Defendant to share such information, pursuant to the federal, state and common law.

7.       The Website was coded to include the Pixel, which Defendant has allowed to operate on its website, and which results in Defendant's sharing of Tracked Users' PHI with Facebook. The Pixel monitors for events specified by the Defendant and sends Tracked Users' FID and PHI to Facebook whenever that Pixel Event occurs on the Website. In this case, Defendant's data sharing is automatically triggered when a Tracked User visits any of Defendant's webpages with a PageView, SubscribedButtonClick, and FindLocation pixel event (the "Pixel Events") active on Defendant's webpages. As detailed more fully below, these Pixel Events

---

[6] *Meta for Developers: Meta Pixel*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/ (last visited November 6, 2024).

trigger when a Tracked User conducts searches on the Website, including for information or services relating to a specific health condition. When a user performs these actions and has previously or is currently signed into Facebook using the same browser used to access the Website, the Website triggers one or more of the Pixel Events and the user's PHI is automatically shared with Facebook.  Accordingly, the Pixel allows Facebook to know the health conditions of the Tracked Users of the Website, the location and expertise/specialty of doctor(s) Tracked Users' searched for, and what type of health information Tracked Users searched for on the Website. Additionally, as the search results on the Website include services offered by Defendant related to what was searched, the Defendant utilizes Tracked User's information to recruit Tracked Users to use their services.

8.      Defendant shares the PHI—i.e., Tracked Users' unique FID and PHI—as one data point to Facebook. Because the user's FID uniquely identifies an individual's Facebook user account, Facebook—or any other ordinary person—can use it to quickly and easily identify the account holder and view that user's corresponding Facebook profile.

9.      The Website's Tracked Users are not adequately informed about the dissemination of their PHI. Tracked Users are not given an opportunity to consent to the dissemination of their PHI; instead, it is automatic. Tracked Users cannot exercise reasonable judgment to defend themselves against the methods used by Defendant to collect and use their PHI.

10.     Incorporation of the Pixel onto the Website provides numerous benefits to Defendant. One such benefit is allowing Defendant to analyze user experiences and behavior on the Website to assess the Website's traffic and functionality. Use of the Pixel also allows Defendant to target or retarget their Tracked Users with advertisements, along with measuring how well those advertisements are working.

4

11.     Facebook also benefits directly when a third-party website implements the Pixel. When placed on a third-party website, the Pixel allows Facebook to surreptitiously gather information regarding all user interactions with the website. Facebook then aggregates the data it collects across all the websites that implement the Pixel.[7] By collecting this user information, Facebook can improve its machine-learning algorithm to better identify and target users across the web, improving the effectiveness of its advertising services, ultimately making Facebook more marketable as an advertising broker.

12.     The Pixel's data collection methods make its integration into healthcare websites, which serve as repositories for confidential medical data, all the more concerning.

13.     As alleged more fully below, when a Tracked User inputs information into the Website to search for places of care, doctors, or symptoms related to a health condition, that information is transmitted to Facebook through the Pixel. Depending on the activity this information may include explicit details regarding that Tracked User's potential or actual medical conditions, along with symptoms they may be experiencing.

14.     The information transmitted through the Pixel includes health conditions (e.g., diabetes), medications, pregnancy, and other forms of PHI, and is then used by Facebook to better target users with advertisements.

15.     Defendant's tracking, sharing, interception, and storage of information – directly, and as aider and abettor to Facebook's interception – violates Plaintiffs' and Class Members' statutorily-protected privacy in their protected health information, including their current or potential medical conditions, the effect those medical conditions have on their lives, the

---

[7]     *Business Help Center: About Facebook Pixel*, FACEBOOK https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited on November 6, 2024); and *Business Center Help: Metrics and estimates using Accounts Center accounts*, FACEBOOK https://www.facebook.com/business/help/283579896000936  (last visited on November 6, 2024).

symptoms of those medical conditions, and health concerns that users may be experiencing, tied to their personally identifiable information.

16.     Through the enactment of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936 (1996), and regulations codified by the United States Department of Health and Services ("HHS"), national standards were established to protect the confidential health information of patients across the United States. [8]

17.     By visiting the Website, Plaintiffs and Class Members entrusted Defendant with their PHI. Plaintiffs and Class Members had a reasonable expectation that their PHI would be kept safe from unauthorized disclosure.

18.     In violation of that trust, and in contravention of their own privacy terms, Defendant disclosed Plaintiffs' and Class Members' PHI to Facebook without authorization or consent to further Defendant's own commercial interests. Defendant has thus failed to safeguard Plaintiffs' and Class Members' sensitive personal, including health, information in violation of federal and state law.

19.     Defendant has profited from these unauthorized disclosures of Plaintiffs' and Class Member's PHI as explained below. The collection of such data additionally allowed pharmaceutical and other related companies to send targeted advertising to Plaintiffs and Class Members based on their PHI.

---

[8] HIPAA defines personal health information as individually identifiable health information that is transmitted or maintained in any form or medium (electronic, oral, or paper) by a covered entity or its business associates, excluding certain educational and employment records. "Individually identifiable health information" is information, including demographic data, that relates to: (1) the individual's past, present or future physical or mental health or condition, (2) the provision of health care to the individual, or (3) the past, present, or future payment for the provision of health care to the individual; and that identifies the individual or for which there is a reasonable basis to believe it can be used to identify the individual. Individually identifiable health information includes many common identifiers (e.g., name, address, birth date, Social Security Number).

20.    Without Facebook's unlawful data collection, Plaintiffs would not have been subjected to personalized advertisements based on their PHI, including advertisements shown based on the sensitive PHI Tracked Users' provided to the Website.

21.    As part of Facebook's advertising operations, Facebook customizes and directs these advertisements specifically toward Plaintiffs and Class Members. Facebook offers, sells, and profits from the access it provides third parties to individuals who are highly likely to be interested in their products or services, commonly referred to as a target audience.

22.    Despite Facebook's knowledge that the Pixel collects highly sensitive PHI on the Website, Facebook continues to collect and profit from the information collected.

23.    Moreover,  Defendant knew or had reason to know, that by implementing the Pixel on its Website, it would cause the collection and sharing of Plaintiffs' and Class Members' sensitive PHI.[9]

24.    Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons. Plaintiffs and Class Members seek relief in this action individually and on behalf of users of the Website for violations of their right to privacy and for violations of various federal and state laws.

## THE PARTIES

### A.    Plaintiffs

25.    Plaintiff Robert Bussard is a resident of Lincoln Nebraska, and is a "consumer" as defined by *15 U.S.C. § 1681a*. In or around 2012, Mr. Bussard began visiting the Website. During his visits to the Website, Mr. Bussard was not provided an opportunity to review or consent to share his personal information, or consent to the use of the tracking tools, or to the sharing of any

---

[9] *Meta Business Tools Terms*, FACEBOOK https://www.facebook.com/legal/businesstech (last visited November 6, 2024) (advising Pixel users, like the Healthcare Defendant, of the tracking tool's capabilities).

of his personal information such as his statutorily protected health information. Plaintiff Bussard has a Facebook account and has been a user of Facebook since around 2008. Plaintiff Bussard has used the Website to search for information related to health conditions or suspected health conditions on a computer or other device, for both himself, and his family members. Specifically, Plaintiff Bussard's use of the Website included using the Website's search function in a Chrome web browser to search for information related on location of doctors to treat his health conditions on or about March 2024, and in the past. Plaintiff Bussard's Facebook profile contains information like his name, photos, posts, and friends. While utilizing the Website, Plaintiff Bussard was signed into his Facebook profile, or had signed into his Facebook profile in the same browser within the past year.

26.     Plaintiff Daniel Gibson is a resident of Lincoln Nebraska and is a "consumer" as defined by *15 U.S.C. § 1681a*. In or around 2021, Mr. Gibson began visiting the Website. During his visits to the Website, Mr. Gibson was not provided an opportunity to review or consent to share his personal information, or consent to the use of the tracking tools, or to the sharing of any of his personal information such as his statutorily protected health information. Plaintiff Gibson has a Facebook account and has been a user of Facebook since around 2009. Plaintiff Gibson has used the Website to search for doctors and Bryan hospital locations, for both himself, and his family members. Plaintiff Gibson also utilized the Website to search for information related to his actual and suspected health conditions. Specifically, Plaintiff Gibson's use of the Website included using the Website's search function in a Chrome web browser to search for information related on location of doctors to treat his health conditions from 2022 to July 11, 2024 and in the past. Plaintiff Gibson's Facebook profile contains information like his name, location, photos, Instagram link, posts and friends. While utilizing the Website, Plaintiff Gibson was signed into

his Facebook profile, or had signed into his Facebook profile in the same browser within the past year.

**B.    Defendants**

27.    Defendant Bryan Health is a non-profit health system company with headquarters at Lincoln, Nebraska, U.S., having its address located at 1600 S. 48th St., Lincoln, NE 68506-1299.  Bryan Health encourages its thousands of Tracked Users and prospective Tracked Users to utilize the Website to manage healthcare, conduct searches related to their health conditions, and search for hospital locations and doctors.

**JURISDICTION AND VENUE**

28.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from at least one Defendant.

29.    This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in this district, and the Defendant derives revenue in the State of Nebraska from its management and operational control, as well as the revenue sharing, advertising sales, etc. that the Defendant derives from the Bryan Website.

30.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is located in this District, and Defendant conducts substantial business operations in this District. Defendant conducts the development and decision making of the Website  in this District, and the harms associated with the Pixel's activation on PHI Users' computers occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### A.    Legislative Backgrounds

#### a.    *Background to the Federal Wiretap Act*

31.    The Federal Wiretap Act (the "Wiretap Act") was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications."[10]

32.    The Wiretap Act was primarily concerned with government's use of wiretaps but was amended in 1986 through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions as though they were government intrusions.[11]

33.    Congress was concerned that technological advancements were rendering the Wiretap Act out-of-date, such as "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing."[12]

34.    As a result, the ECPA primarily focused on two types of computer services which were prominent in the 1980s: (i) electronic communications such as email between users; and (ii) remote computing services such as cloud storage or third-party processing of data and files.[13]

35.    Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person or entity: (i) provides an electronic communication service to the public; and (ii) intentionally divulges the contents of any communication; (iii) while the communication is being transmitted on that service; (iv) to any person or entity other than the intended recipient of such communication.

---

[10] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, WASHINGTON AND LEE JOURNAL OF CIVIL RIGHTS AND SOCIAL JUSTICE, https://scholarlycommons.law.wlu.edu/cgi/viewcontent.cgi?article=1541&context=crsj (last visited November 6, 2024)..
[11] *Id.* at 192.
[12] Senate Rep. No. 99-541, at 2 (1986).
[13] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).

36.     While communicating with Defendant, users had the contents of their communications shared with Facebook.

### b.     Background on the Nebraska Wiretap Act

37.     Nebraska Revised Statute § 86-297, enacted in 1988 through Legislative Bill 899, established a civil cause of action for individuals whose wire, electronic, or oral communications have been intercepted, disclosed, or intentionally used in violation of Nebraska's wiretap laws.[14]

38.     The statute was part of a broader legislative effort to align Nebraska's wiretap regulations with federal standards, particularly those outlined in the Electronic Communications Privacy Act of 1986 (ECPA).[15] The ECPA amended the federal Wiretap Act to address emerging technologies and provided a private right of action for unauthorized interceptions of electronic communications. By enacting § 86-297, Nebraska aimed to enhance privacy protections for its residents in response to advancements in communication technologies.[16]

39.     In 2002, as part of a comprehensive recodification of telecommunications statutes, § 86-297 was renumbered from its original designation (§ 86-707.02) to its current form.[17] This recodification was intended to streamline and update the state's telecommunications laws to reflect contemporary practices and technologies.

40.     Nebraska Revised Statute § 86-297 serves as a critical component of the state's legal framework, providing individuals with a means to seek redress for unauthorized

---

[14] *Legislative Bill 899*, Nebraska Legislature (Apr. 8, 2024), https://nebraskalegislature.gov/FloorDocs/90/PDF/Slip/LB899.pdf (last visited November 7, 2024).
[15] *LB 897-931 LR 247-253*, NEBRASKA LEGISLATURE, https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://nebraskalegislature.gov/transcripts/download_pages.php%3Fleg%3D90%26bill%3DLB%2520900%26pages%3D6760%2B8001%2B%26download%3Dpdf&ved=2ahUKEwjZ7JCcj82JAxUaE1kFHalFKNkQFnoECBYQAQ&usg=AOvVaw1Y-3HvMEt-ujrzdwvJ6zTb (last visited November 7, 2024).
[16] *Id.*
[17] *Nebraska Telecommunications Act, Chapter 86,* NEBRASKA LEGISLATURE, https://nebraskalegislature.gov/laws/laws-index/chap86-full.html (last visited November 7, 2024).

interceptions of their communications and reinforcing the state's commitment to protecting privacy rights in the digital age.

41.    A violation of Nebraska Revised Statute § 86-290 occurs when an individual's wire, electronic, or oral communication is intercepted, disclosed, or intentionally used in contravention of the state's laws governing such activities.

42.    While communicating with Defendant, users had the contents of their communications shared with Facebook in violation of Nebraska Revised Statute § 86-290. Defendant's violation of Nebraska Revised Statute § 86-290 through their interception of Plaintiffs' PHI gave rise to Plaintiffs' cause of action under Nebraska Revised Statute § 86-297.

**B.    How Websites Function**

43.    Websites are hosted on servers, in the sense that their files are stored on and accessed from servers, however, websites are, in part, "run" on a user's internet browser as the browser loads and processes the website's code to display the webpage.

44.    Websites are a collection of webpages, and each webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[18]

45.    Files written in HTML are processed from top to bottom, meaning any line of code that is not at the bottom of the page will have executed before the file has been completely loaded.[19]

46.    Webpages each have a unique address, and two webpages cannot be stored at the same address.[20]

---

[18] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines    (last    visited November 6, 2024).
[19] *How does a web browser interpret HTML?*, TUTORCHASE, https://www.tutorchase.com/answers/a-level/computer-science/how-does-a-web-browser-interpret-html (last visited November 7, 2024).
[20] *Id.*

47.    When a user navigates to a webpage (such as entering a URL address directly or clicking a hyperlink containing the address), the browser contacts the DNS server, which translates the web address of that website into an IP address.[21]

48.    An IP (Internet Protocol) address is "a unique address that identifies a device on the internet or a local network."[22] Essentially, an IP address is:

> the identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.

49.    The user's browser then sends an HTTP Request to the server hosting that IP address, requesting a copy of the website be sent to the user, which, if approved, receives a HTTP Response that authorizes the HTTP Request and begins the process of sending the webpage's files to the user in small chunks.[23]

50.    The user's browser then assembles the small chunks back into HTML, which is then processed by the user's browser and "rendered" into a visual display according to the instructions of the HTML code.[24]  This is the visible, and usually interactable, website that most people think of.

51.    This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

---

[21]    *How the web works*, MOZILLA  https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited November 6, 2024).

[22] *What is an IP Address – Definition and Explanation*, KASPERSKY  https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited November 6, 2024).

[23] *Id.*

[24] *Id.*

**C.    Facebook's Advertising Business and Pixel**

52.    Facebook was founded in 2004 by Mark Zuckerberg, Eduardo Saverin, Dustin Moskovitz, and Chris Hughes. Facebook began as a social networking website for college students,[25] and quickly saw success gaining more than one million users in 2004, and more than six million by 2005.

53.    By 2008, Facebook's popularity surpassed Myspace, making it the leading social networking platform. [26]

54.    Recognizing the significance of having direct connection to millions of consumers, Facebook initiated the monetization of its platform in 2007 through the introduction of "Facebook Ads."[27] This new advertising approach promoted a "completely new way of advertising online" that would enable advertisers to deliver more personalized and pertinent advertisements.[28]

55.    At present, Facebook offers advertising services on its own platforms, including Facebook and Instagram, in addition to external websites through the Facebook Audience Network.[29] Facebook now has over 2.9 billion active users and has extensive advertising reach[30]

56.    Facebook provides various advertising targeting options which cater to an advertiser's desired audience. These options include "Core Audiences," "Custom Audiences," "Look Alike Audiences,"[31] and a more detailed targeting approach known as "Detailed

---

[25] Jay Fuchs, *How Facebook Ads Have Evolved [+What This Means for Marketers]*, HubSpot (June 11, 2021), https://blog.hubspot.com/marketing/history-facebook-adtips-slideshare (last visited November 6, 2024).

[26] Michael Arrington, *Facebook No Longer The Second Largest Social Network*, TECHCRUNCH (JUNE 13, 2008) https://techcrunch.com/2008/06/12/facebook-no-longer-the-second-largest-social-network/ (last visited on November 6, 2024).

[27] *Facebook Unveils Facebook Ads*, FACEBOOK (Nov. 6, 2007) https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/ (last visited November 6, 2024).

[28] *Id.*

[29] *Business Help Center: About Meta Audience Network*, FACEBOOK https://www.facebook.com/business/help/788333711222886?id=571563249872422 (last visited November 6, 2024)

[30] *Id.*

[31] *Target Audiences: Hitting The Bullseye With Facebook Ads*, SPRAGUE MEDIA https://spraguemedia.com/blog/target-audiences-bulleye-with-facebook-ads/ (last visited November 6, 2024).

Targeting." Each of these advertising tools enables advertisers to focus on specific users based on their personal data, which includes factors such as geographic location, demographics, interests, connections, and behaviors among other criteria.[32] The creation of such audiences can be done by Facebook, the advertiser, or a combination of both.

57.    Based on Facebook's ability to target specific users so precisely, it is unsurprising that Facebook's advertising service swiftly emerged as the most prosperous business division within Facebook. Millions of companies and individuals avail themselves of Facebook's advertising offerings.

58.    In 2009, Meta generated $761 million in revenue through its advertising operations. A decade later, Facebook's advertising revenue skyrocketed, experiencing an exponential growth of almost 100 times.[33]

59.    As shown below, Facebook generates essentially all of its revenue from selling advertising placements to marketers.

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|---------------|------------|--------------|
| 2021 | $117.93 billion | $114.93 billion | 97.46% |
| 2020 | $85.97 billion | $84.17 billion | 97.90% |
| 2019 | $70.70 billion | $69.66 billion | 98.52% |
| 2018 | $55.84 billion | $55.01 billion | 98.51% |
| 2017 | $40.65 billion | $39.94 billion | 98.25% |

60.    Indeed, their advertising revenues have continued to grow: a recent report indicates that Facebook's revenues from advertising alone are set to hit $153.76 billion in 2023, representing a 13.1% increase from 2022.[34]

---

[32] *Id.*
[33] Rishi Iyengar, *Here's how big Facebook's ad business really is*, CNN BUSINESS (July 1, 2020), https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html (last visited November 6, 2024).
[34] *Facebook Ad Revenue (2017-2026)*, OBERLO https://www.oberlo.com/statistics/facebook-ad-revenue (last visited November 6, 2024).

61.    Facebook's ad-targeting capabilities have faced consistent scrutiny due to its capacity to target individuals using highly detailed data. For example, Meta reached a settlement with the Department of Justice regarding its Lookalike Ad service in 2022. The Lookalike Ad service allowed discriminatory targeting by landlords based on race and other demographic factors, resulting in a violation of federal law.

**D.    Facebook's Pixel**

62.    According to Peter Eckersley, the Chief Computer Scientist at the Electronic Frontier Foundation, Facebook's tracking tools enable Facebook to gather extensive information about individuals, and with the help of artificial intelligence, analyze the behavior of those individuals.[35] The comprehensive knowledge resulting from implementation of its tracking tools is ideal for advertising purposes, allowing for highly targeted and effective targeted advertising campaigns.

63.    Facebook employs diverse tracking methods to gather data about individuals, which includes incorporating software development kits into third-party applications[36], utilizing "Like" and "Share" buttons (referred to as "social plug-ins"), and employing various other methodologies.[37] This accumulated data is subsequently leveraged to enhance Facebook's advertising business. One of the most notable tools in Facebook's tracking arsenal is the Pixel, which was introduced in 2015 and holds significant influence as described below.[38]

---

[35] Sam Harnett, *Here's the Data Facebook Has on Users and How the Company Gathers It*, KQED (Mar. 22, 2018) https://www.kqed.org/news/11657315/heres-the-data-facebook-has-on-users-and-how-the-company-gathers-it (last visited November 6, 2024).

[36] *How Facebook tracks you in Android (even if you don't have a Facebook account)*, MEDIUM (Nov. 11, 2019) https://medium.com/codomo/how-facebook-tracks-you-on-android-even-if-you-dont-have-a-facebook-account-92613e0c017a (last visited November 6, 2024).

[37] *Meta for Developers: Social Plugins*, FACEBOOK  https://developers.facebook.com/docs/plugins/ (last visited November 6, 2024).

[38] Cecile Ho, *Announcing Facebook Pixel*, FACEBOOK (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/ (last visited November 6, 2024).

64.     Facebook promotes the Pixel as an innovative solution for reporting and optimizing conversions (clicks to purchases), audience building, and gaining valuable insights into website usage. Facebook emphasized that website owners could easily utilize the Pixel by embedding an image that occupies a single pixel on a webpage, enabling them to track and optimize conversions. This feature allows website owners and advertisers to gauge the effectiveness of their advertising efforts by monitoring the actions taken by individuals on their website.

65.     For Facebook, the Pixel serves as a channel for collecting and transmitting information collected by websites utilizing the Pixel to Facebook. This information is relayed through scripts on the website, executed within the user's internet browser.

66.     Facebook also has the ability to connect the data with a user's Facebook account using the "Facebook Cookie." This cookie serves as a solution to counteract cookie-blocking methods, including one created by Apple, Inc., that aim to monitor user activities.[39] Cookies, or small data files placed on a user's PC while using a website, are often used as a means to store information about a user's identity or activity on websites. While companies like Apple, Inc. try to limit cookie functionality, Facebook has developed a first-party cookie that serves as a solution to counteract cookie-blocking methods.[40]

67.     A function of the Pixel is to gather, collect, and then share user information with Facebook.[41] This information enables Facebook and the web developers to build valuable

---

[39] *What Facebook's First-Party Cookie Means for AdTech*, CLEARCODE https://clearcode.cc/blog/facebook-first-party-cookie-adtech/ (last visited November 6, 2024).
[40] *Id.*
[41] Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta for Developers: Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited on November 7, 2024).

personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[42]

68.     The surreptitious communications described above happen without the users' knowledge.

69.     Once installed, the Pixel provides website owners with data and analytics tools about ads which they have placed on Facebook and the various tools being used to target people who have visited their website.  An article published by markup.org confirms this functionality.[43]

70.     Web developers and website operators can choose to use the Pixel to share both user activity and user identity with Facebook.

71.     The information collected by the Pixel is sent to Facebook with PII, which includes the user's IP address, name, email, phones number, and specific Facebook ID that points to the user's Facebook profile. This PII is stored across a number of cookies and by Facebook on its servers, which it maintains for years in some cases.[44]

72.     Despite claiming to "hash" PII provided by Tracked User, Facebook actually utilizes the hashed format with the specific intention of linking Facebook Pixel data to Facebook profiles. Facebook has engineered the Pixel in a way that allows it to receive real-time information about Tracked User's actions on the medical provider's online platforms. Whenever a Tracked User performs any action on a webpage that includes Pixel, such as clicking buttons for registration, login, logout, or appointment creation on a Tracked User portal, the embedded

---

[42] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited on November 6, 2024)

[43] Todd Feathers, et al., *Facebook is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (July 19, 2023) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited on November 6, 2024).

[44] *Id.*

Facebook code intercepts the content of the Tracked User's interaction to Facebook while the communication between the Tracked User and the medical provider is still ongoing.

73.     Between the 33 top 100 hospitals that were discovered to have Pixel report on by the markup.org article, which similarly collect and transmit Tracked User appointment information to Facebook, these hospitals together reported over 26 million Tracked User admissions and visits in the year 2020 alone. The total number of affected Tracked Users will inevitably trend higher as The Markup's investigation was limited to slightly over 100 hospitals.

74.     One legal officer at Privacy International, Laura Lazaro Cabrera, highlighted that even having access to a portion of these data points, such as solely the URLs accessed by users, poses concerns regarding Facebook's usage. In reasoning, Cabrera emphasized that users should: "'[t]hink about what you can learn from a URL that says something about scheduling an abortion' . . . 'Facebook is in the business of developing algorithms. They know what sorts of information can act as a proxy for personal data.'"[45]

75.     In a recent development, employees at Facebook acknowledged the insufficient safeguards in place for protecting sensitive data. Engineers working on the ad and business product team at Facebook expressed in a privacy overview from 2021 that they lack the necessary level of control and transparency regarding the utilization of data within their systems during a privacy overview in 2021.[46]As a result, they are unable to make well-informed policy changes or external commitments, such as stating with confidence that they will not use specific data for certain purposes.

---

[45] Grace Oldham and Dhruv Mehrotra, *Facebook and Anti-Abortion Clinics Are Collecting Highly Sensitive Info on Would-Be Patients*, THE MARKUP (June 15, 2022), https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients (last visited November 6, 2024).

[46] Lorenzo Franceschi-Bicchierai, *Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document* (Apr. 26, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-orwhere-it-goes (last visited November 6, 2024).

76.     Website owners – such as Defendant Bryan Health– hold the decision-making authority to add the Pixel code to its webpages. The owner may not hand-select every detail associated with the website, ranging from the use of certain font, colors, etc., to the employment of tracking tool, such as the Pixel, or a keystroking monitor, or which and whether terms and conditions should be associated with its website, newsletter, or any other aspect of its business. The level of management or oversight by the owner, however, does not alter or reduce, and certainly does not eliminate, its responsibility over the functionality of its website made available to visitors, or what is gathered about its user and then shared with third parties.

### a.     *Defendant added the Pixel to the Website*

77.     To activate and employ a Facebook Pixel, a website operator must first sign up for a Facebook account, where specific "business manager" accounts are provided the most utility for using the Pixel.[47] For instance, business manager accounts can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Ad Accounts and Pages from a centralized interface, (iii) access and manage by multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) build custom audiences for multiple ad campaigns, and (v) eliminate privacy concerns related to using a personal profile for business purposes.[48]

78.     The website operator must utilize the tools made available to it by Facebook in order to cause the Pixel to be created and added to its site. The process begins with the website operators' naming of the Pixel at the time of its creation.[49]

---

[47]  *Business Help Center: How to create a Meta Pixel in Business Manager*, FACEBOOK, https://www.facebook.com/business/help/314143995668266?id=1205376682832142 (last visited November 6, 2024).

[48] Jacqueline Zote, *A step-by-step guide on how to use Facebook Business Manager* (June 14, 2021), SPROUTSOCIAL https://sproutsocial.com/insights/facebook-business-manager/ (last visited November 6, 2024).

[49]  *Id.; see also* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YOUTUBE https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited November 6, 2024).

79.     Once the Pixel is created, the website operator will assign access to the Pixel to specific people for management purposes,[50] as well as connect the Pixel to a Facebook Ad account.[51]

80.     To add the Pixel to its website, the website operator can choose to add the Pixel code through (i) the "event setup tool" via "partner integration" or (ii) by manually adding the code to the website.

81.     Manually adding base Pixel code to the website consists of a multi-step process, which includes: (i) creating the pixel; (ii) installing base code in the header of every webpage the Pixel is active, (iii) setting automatic advanced matching behavior, (iv) adding event code using an automated tool or manually,[52] (v) domain verification, and (vi) configuring web events.[53]

82.     After following these steps, a website operator can start harvesting information using the Pixel.

83.     A Pixel cannot be placed on a website by a third-party without being given access by the site's owner.

84.     When a Facebook user logs onto Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number– is automatically created and stored on the user's device for up to a year.[54]

---

[50] *Business Help Center: Add People to Your Meta Pixel in Your Meta Business Manager*, FACEBOOK https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited November 6, 2024).

[51] *Business Help Center: Add an ad account to a Meta Pixel in Meta Business Manager*, FACEBOOK https://www.facebook.com/business/help/622772416185967 (last visited November 6, 2024).

[52] Some users claim that automated tools for adding event code provide inconsistent results and recommend adding event code manually. *See* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YOUTUBE, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited November 6, 2024).

[53] *Business Help Center: How to set up and install a Meta Pixel*, FACEBOOK https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited November 6, 2024); *see* Ivan Mana, *How to Set Up & Install the Facebook Pixel (in 2022)*, YOUTUBE https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited November 6, 2024).

[54] *Privacy Center: Cookies Policy*, FACEBOOK https://www.facebook.com/policy/cookies/ (last visited November 6, 2024).

85.    The Facebook UID can be used, by anyone, to easily identify a Facebook user. Any person, even without in-depth technical expertise, can utilize the UID. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]). That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

86.    In addition to the c_user cookie, the Pixel also transmits personally identifying information connected with a Tracked User in the form of cookie identifiers, including IP address, browser fingerprints and device identifiers.

87.    Browser-fingerprints are "information collected about a remote computing device for the purpose of identification."[55] Browser fingerprints include information such as "operating system, active plugins, time zone, language, screen resolution, and various other active settings."[56] A study in 2017 demonstrated that browser fingerprinting techniques can be used to successfully identify 99.24 percent of all users.[57]

---

[55] *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXELPRIVACY https://pixelprivacy.com/resources/browser-fingerprinting/ (last visited November 6, 2024).
[56] *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXELPRIVACY https://pixelprivacy.com/resources/browser-fingerprinting/ (last visited November 6, 2024).
[57] Yinzhi Cao, Song Li and Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features*, NDSS (Feb. 27, 2017) https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/ (last visited November 6, 2024).

b.    *The Pixel as a Tracking Method*

88.    The Pixel tracks user-activity on web pages by monitoring events which,[58] when triggered, causes the Pixel to automatically send data directly to Facebook.[59]

89.    Examples of events utilized by websites are: (i) when pre-designated buttons are clicked (the"SubscribedButtonClick event"), (ii) visiting webpages with a Pixel installed (the "PageView event"); and (iii) using custom designed Pixel events such as when users seek to find the location of a doctor or hospital to (the "FindLocation event").[60]  The  Defendant's Website utilized all three of these Pixel Events.[61]

90.    When a PageView Pixel event is triggered, a "HTTP Request" is sent to Facebook (through Facebook's URL www.facebook.com/tr/).[62]

91.    The HTTP Request includes a Request URL, embedded cookies such as the c_user cookie. It may also include information in its Payload, such as metadata tags.

92.    A Request URL, in addition to a domain name and path, typically contains parameters. Parameters are values added to a URL to transmit data and direct a web server to provide additional context-sensitive services, as depicted below:

---

[58]    *Meta    Business    Help    Center:    About    Meta    Pixel*,    FACEBOOK https://www.facebook.com/business/help/742478679120153?id=1205376682832142(last    visited    November    6, 2024).
[59]*See generally Id.*
[60]    *Meta    Business    Help    Center:    Specifications    for    Meta    Pixel    standard    events*,    FACEBOOK https://www.facebook.com/business/help/402791146561655?id=1205376682832142    (last    visited    November    6, 2024).
[61]    The presence of Pixel events, such as the Microdata and PageView events, can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See Business Help Center: About the Meta Pixel Helper*, FACEBOOK https://www.facebook.com/business/help/198406697184603?id=1205376682832142    (last    visited    November    6, 2024).
[62] *How We Built a Meta Pixel Inspector*, THE MARKUP https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector(last visited November 6, 2024).



*Figure 1 – Mozilla's diagram of a URL, including parameters[63]*

93.     Tracked Users experienced the detrimental consequences of Facebook's illicit gathering and dissemination of their PHI. Plaintiffs, as users of the Website, had their sensitive personal health information shared with Facebook, without their consent.

94.     To demonstrate the Pixel's operation on the Website, Tracked Users can utilize the Website to find a doctor, by clicking "find a doctor," they are subsequently prompted to enter information such as the location and the specialty of the doctor they are looking for:

*Figure 2 - Find a Doctor function on the Website*

95.     A Tracked User searching to find a doctor to treat a heart condition, for example, is prompted to select "Pulmonology" as a "Specialty." These doctors are part of Defendant's hospital network. The "Find a Doctor" page of the Website is used to connect current and

---

[63] *What is a URL?*, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited November 6, 2024).

prospective patients, including Tracked Users, with Defendant's medical providers to treat specific conditions.

96.     When Tracked Users search to find a doctor through the Website, all their interactions with the Website are disclosed to Facebook, including what type of doctor they are looking for related to their specific health conditions, and the doctors they are ultimately considering. When a user clicks on a specific doctor based on their specialty or other specific features, that information is sent to Facebook along with the Tracked User's unique Facebook ID captured in the c_user cookie. In the case of the Website's "Find a Doctor" page, the Tracked User's PHI is shared through the *PageView* and SubscribedButtonClick Pixel event. As described above, the PageView Pixel event triggers whenever a webpage containing a Pixel is loaded onto a Tracked Users' computer. The SubscribedButtonClick Pixel event triggers whenever a pre-designated button is clicked by a Tracked User, sending URL and parameters information, along with any metadata contained in the button and webpage. [64] This is depicted in *Figure 3,* next page:

---

[64] *What are the Subscribedbuttonclick and MicroData events and can/should I disable this?*, FARMER'S RANDOM WEB/AD TECH PROBLEMS (Dec. 28, 2017) http://randomproblems.com/subscribedbuttonclick-microdata-events-can-disable-facebook-pixel-autoconfig-feature/ (last visited November 6, 2024).



*Figure 3 - Screenshot of Data Transmission via Page View Pixel Event when Tracked User uses the Find a Doctor Function on the Website*



*Figure 4 - Screenshot of SubscribedButtonClick Event transmitting URL, metadata, and parameters on the Website, , where metadata is identified by "cd[meta_data_title]=meta_data_value"*

97.    In addition to the information captured by the Page View Pixel Event depicted above in *Figure 3 and 4,* the PageView and SubscribedButtonClick Pixel Event capture information Tracked User searched for and transmits this information along with the Tracked User's Facebook ID to Facebook. This is depicted in *Figures 5,* next page:



*Figure 5 - PageView Pixel Event captures URL and discloses it, and FID, to Facebook in a single transmission, where the c_user has been edited to maintain the privacy of the investigator*

98.    The information disclosed to Facebook is typically censored for healthcare providers.[65] However, Defendant discloses this information along with the Tracked User's unique Facebook ID, enabling Facebook to link the Tracked User's protected PHI with the user's unique FID, and then identify that specific Tracked User.  The above representation of data transmission is consistent across all searches conducted on the Defendant's Website.

99.    In addition to transmitting a Tracked User's doctor search information, Defendant also surreptitiously intercepts and relays Tracked User's search terms to Facebook.

---

[65]    *Business    Help    Center:    About    Sensitive    Health    Information,* FACEBOOK  https://www.facebook.com/business/help/3619488782018809?id=188852726110565 ("If Meta's signals filtering mechanism detects Meta Business Tools data that it categorizes as potentially sensitive health-related data, the filtering mechanism is designed to prevent that data from being ingested . . . .") (last visited November 6, 2024).

100.    The search function of the Website is used as a method to entice and maintain the Website visitors' interaction, including for prospective Tracked Users who are considering becoming patients of Defendant for specific conditions.

101.    Defendant prompts Tracked Users to search for information related to their medical conditions (*i.e.*, "Diabetes") on the Website. Unbeknownst to Tracked Users, the Website's search function, used to search for specific medical symptoms, ailments, treatments, etc., shares the contents of their searches and their unique FIDs via the SubscribedButtonClick Event as depicted below in *Figures 6* and *7* the Website's search function, used to search.



*Figure 6 - Screenshot of search term used in sample search, along with the term included in the URL, and resulting Pixel Events*



*Figure 7 - Screenshot of User's Search Results page on the Website, and Search Terms Associated with that User's Search being Disclosed by the Search Bar triggering the SubscribedButtonClick Pixel Event*

102.    The search results additionally include links to services offered by Defendant related to their PHI.

103.    The data transmission represented in *Figure 7* is consistent across all searches conducted through the Defendant's Website.

104.    As evident from the search results displayed in Figure 7 above, the information a Tracked User searches on the Website can reveal extremely personal information related to that individual's PHI. By conducting a simple search for "Diabetes" on the Website, the user tells Facebook that the Tracked User is likely diabetic or is looking for a doctor to help assess a diabetes.

105.    Putting together the data the Pixel Events collect, including (1) searches for specific symptoms, illnesses, etc., (2) searching for and filtering through doctors by specialty, and (3) looking for locations of care, Meta has more information available to analyze whether a person is actually suffering from an illness.

106.    This process results in Facebook obtaining knowledge that the Tracked User is potentially diabetic, with no consent from the Tracked User. Nothing on the Website indicates to Tracked Users that utilizing the Website's search function will reveal their PHI along with the exact content of their communications with the Website. This process is automatic, surreptitiously

collecting and transmitting users PHI to Facebook for advertising purposes. Upon clicking "Search" to search the Website for information related to their PHI, or looking for a care location or doctor with a specialty related to their health conditions, the Pixel Event is triggered, showing the Pixel's transmission of the Tracked User's PHI to Facebook.

107.    As a result of this process, Facebook receives information from Defendant including a full-string detailed URL, which includes the name of the website, the web pages the Tracked User viewed, the name of the doctor a Tracked User is considering, and search terms entered by the Tracked User. Additionally, Defendant causes the transmission of Tracked User's cookie identifiers, including IP address, browser fingerprints and device identifiers.

108.    By integrating the Website with code that results in the disclosure of Tracked Users' PHI, Defendant knowingly disclosed information that allowed Facebook and advertisers to link Tracked Users' PHI to their identities and target them based on their personal health conditions. Defendant purposefully shares their users' PHI with Facebook in order to financially benefit from the Pixel tool.

### E.    Plaintiffs and Class Members Do Not Provide Authorization to Defendant to Collect and Disclose their PHI

109.    The Defendant has not, and does not, seek nor obtain authorization from their Tracked Users, including Plaintiffs and the Class, to share the Tracked User's PHI with third parties, including Facebook.

110.    Plaintiffs and the Class were unaware that Defendant actively collects their sensitive PHI when visiting the Website, searching for doctors, and searching for information related to their health conditions on the Website. The presence of the Pixel is completely inconspicuous, as it is seamlessly integrated and hidden in the background of the Website's code.

111.    Facebook Data Policy explicitly states that businesses utilizing the Pixel are obligated to possess legal rights to collect, use, and share user data before sharing any data with Facebook.[66]

112.    Facebook does not verify whether the businesses utilizing the Pixel has indeed obtained the necessary consent.

113.    Facebook relies on its business customers to police themselves. Businesses need only "represent and warrant" that they have adequately and prominently notified users about the collection, sharing, and usage of data through their Business Tools.[67]

114.    The Pixel can be accessed by any business or publisher regardless of the nature of their business. It is worth noting that the collection of sensitive medical information belonging to the Plaintiffs contradict the other provisions outlined in Facebook's Data Privacy policy. Specifically, Facebook claims that each of its supposed "partners" is obligated to possess lawful rights to collect, use, and share user data before providing it to Meta.[68] However, Defendant does not have the legal authority to use or share the data of Plaintiffs and the Class, as this information is protected under HIPAA. HIPAA covers all electronically protected health information generated, received, maintained, or transmitted by a covered entity like Defendant. The rule explicitly prohibits the use and disclosure of protected health information to Facebook for targeted advertising purposes, as stated in 45 C.F.R. § 164.502. In essence, Facebook contracts with healthcare providers, like Defendant, but fails to ensure compliance with its own Terms and with state and federal law protecting sensitive health information.

---

[66]    *Meta Business Help Center: About prohibited information*, FACEBOOK, https://www.facebook.com/business/help/1057016521436966?id=188852726110565 (last visited November 7, 2024),

[67] *Meta Business Tools Terms,* FACEBOOK, https://www.facebook.com/legal/terms/businesstools?_rdr (last visited November 7, 2024).

[68]    *Privacy Policy: What is the Privacy Policy and what does it cover?,* FACEBOOK, https://www.facebook.com/privacy/policy/ (last visited November 7, 2024).

**F.    Defendant Knew that Pixel Would Reveal Plaintiffs' PHI and Other Sensitive Medical Information, Including their Health Conditions**

115.    Defendant knew or should have known that by utilizing the Pixel on the Website, they would disclose Plaintiffs' and Class Members' sensitive PHI to Facebook.

116.    Due to the nature of how Pixel functions, which involves sending all user website interactions to Facebook, Defendant was advised that its users' sensitive data would be transmitted to Facebook when users engaged in any form of interaction on their websites, such as looking up information related to a health condition or assessing a health condition.

117.    Facebook is aware that by allowing healthcare providers to implement its Facebook Pixel on to their websites, it facilitates the gathering of sensitive PHI belonging to the Tracked Users of those healthcare providers. Facebook knows that it receives this PHI and it uses this PHI to improve its advertising processes.

118.    Facebook spokesman Dale Hogan said that it is "against [Facebook's] policies for websites and apps to send sensitive health data about people through [its] Business Tools," and that their systems are "designed to filter out potentially sensitive data," those policies and procedures have not been enforced or have been completely ineffective.[69]

119.    To that point, a complaint by the Federal Trade Commission filed in 2021, exhibited that Facebook received medical information through its Business Tools for years. The FTC concluded that Facebook had used that sensitive information for their own research and development purposes.

120.    In or around February 2021, the New York State Department of Financial Services (NYSDFS) reached a similar determination.  It found that Facebook had collected sensitive data,

---

[69] Pratyush Deep Kotoky, *Facebook collects personal data on abortion seekers: Report* (June 16, 2022) https://www.newsbytesapp.com/news/science/facebook-collects-personal-data-on-abortion-seekers/story (last visited November 6, 2024).

including medical information, in violations of its own policies. NYSDFS stated that simply "[m]erely stating a rule, however, has little meaning if the rule is not enforced, and the unfortunate fact is that Facebook does little to track whether . . . developers are violating this rule and takes no real action against developers that do." The NYSDFS stated that Facebook's "Facebook's efforts here [are] seriously lacking" and that "[u]ntil there are real ramifications for violating Facebook's policies, Facebook will not be able to effectively prohibit the sharing of sensitive user data with third-parties."

121.    The Markup article also reported that its investigation into Facebook's "filtering" system revealed that Facebook failed to delete the most obvious forms of sensitive information, which included the URLs with information related to Diabetes.

122.    Additionally, documents leaked to the news organization *Vice* in 2021 exposed that Facebook's employees acknowledged or confirmed Facebook's inability to effectively manage the way its systems utilize data. A Facebook engineer working on the Ad and Business Product team stated that "We do not have adequate level of control and explain ability over how our systems use data, and thus we can't confidentially make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"

123.    A research director at UC Berkley in the Usable Security and Privacy Group has stated that Facebook just does not have the incentive to enforce its own privacy policies because "[t]hat costs them money to do. As long as they're not legally obligated to do so, why would they expend any resources to fix [it]?"[70]

---

[70] Grace Oldham and Dhruv Mehrotra, *Facebook and Anti-Abortion Clinics Are Collecting Highly Sensitive Info on Would-Be Patients*, Reveal (June 15, 2022), https://revealnews.org/article/facebook-data-abortion-crisis-pregnancy-center/ (last visited Nov. 6, 2024).

124.    Defendant purposefully disclosed Plaintiffs' communications to Facebook to improve the effectiveness of their advertising and marketing or to place-third party ads on the Website.

125.    Plaintiffs did not know of or consent to the dissemination of their communications with Defendant to Facebook.

126.    Facebook was not a party to the communications, as Plaintiffs did not know of their involvement in the communications, and Facebook used the intercepted communications for their benefit independent of any benefit to Defendant.

127.    Contrary to Defendant's Privacy Policy, Tracked Users were not provided notice of, let alone given an opportunity to provide written consent to, the tracking tools' interception of Plaintiffs' Queries, webpage interactions, and/or cart activity. Meta guides and cautions website operators, such as Bryan, of the dangers of using its tracking tools without first providing notice of and then obtaining valid consent for invasively collecting Plaintiffs' protected data.[71]

128.    Facebook provides notice through its Business Tools Terms, which encompasses the Pixel, Conversions API, and other tools, and through tutorials it provides on how to use the Pixel. Meijer agreed to these terms, directly or as the effective owner of the Website, in order to utilize and employ the tracking tools.[72]

129.    Meta is clear that while Conversions API collects information through a web developers' servers, the Pixel is used to collect information from users' browsers.[73]

---

[71]    *Meta Business Tools Terms*, FACEBOOK, Section 3(c)(i) https://www.facebook.com/legal/businesstech?paipv=0&eav=AfY375fgb725ZjQrZEqZyhoJsO63s7_tFmEPfgnFpew1xw5Wldq7ONw04KTB0G0o-i4&_rdr (last visited November 7, 2024).

[72]    *Meta Business Tools Terms*, FACEBOOK, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfY375fgb725ZjQrZEqZyhoJsO63s7_tFmEPfgnFpew1xw5Wldq7ONw04KTB0G0o-i4&_rdr (last visited November 7, 2024).

[73]    *Meta for Developers: Conversions API End-to-End Implementation*, FACEBOOK, https://developers.facebook.com/docs/marketing-api/conversions-api/guides/end-to-end-implementation/ (last visited November 7, 2024).

130.     Meta's Business Tools Terms, which a website must accept before making use of the Pixel, are clear that the Pixel will intercept, collect, and transmit two categories of data: (i) "Contact Information" which "personally identifies individuals, such as names, email addresses, and phone numbers" which are used "for matching purposes[;]" and (ii) "Event Data" that reveals information about "people and the actions that they take on your Website and apps . . . such as visits to your sites . . . and purchases of your products" (collectively Business Tool Data).

131.     Meta's Business Tools Terms also highlight that Meta "will not share Business Tool Data provided by a website, including advertisers, unless the website developers opt-in to Facebooks advertising programs or disclosure is mandated by law.[74] In short, Meijer must have opted-in to Meta's data sharing program for advertising purposes.

132.     Meta is also clear in its Business Tools Terms that once they receive Business Tool Data from website developers, like Meijer, Meta will "process the Contact Information . . . to match the Contact Information against user IDs . . . as well as to combine those user IDs with corresponding Event Data.[75]

133.     Perhaps owing to Meta's practice of tying the Contact Information and Event Data together, Meta's terms are clear that website developers **must not** "share Business Tool Data with [Meta] that you know or reasonably should know . . . includes health . . . information or other categories of sensitive information[.]"[76]

134.     In contravention to Meta's terms and guidance, Defendant collected Plaintiffs' PHI and Plaintiffs were not given notice of the use of the tracking tools on the Website, including Meta's Pixel.

---

[74] *Id.* at Section 1(b)
[75] *Id.* at Section 2(a)(i).
[76] *Id.* at Section 1(h)

135.    As a result, Plaintiffs did not and could not provide consent to the collection and sharing of their protected data to the Website via sending Plaintiffs searches on the Website.

**G.    Plaintiffs and Class Members possess a Reasonable Expectation of Privacy in their Sensitive Medical Information and Related Information**

136.    Plaintiffs and Class Members have a reasonable expectation of privacy in their PHI and sensitive medical information.

137.    Specifically, Tracked User's health information is protected under federal law by HIPAA

138.    HIPAA establishes nationwide guidelines for protecting confidential health information. As one example, HIPAA imposes restrictions on the acceptable purposes for using health information and expressly prohibits disclosure without explicit authorization. C.F.R. § 164.502. Additionally, HIPAA mandates that entities subject to its provisions must implement suitable measures to safeguard such information. 45 C.F.R. § 164.53(c)(1).

139.    This legal framework applies to healthcare providers; here, the Defendant.

140.    Pursuant to HIPPA's protections applicable to Defendant, Plaintiffs and the Class Members had a reasonable expectation of privacy in their protected health information.

141.    Studies investigating the gathering and release of individuals' sensitive medical data validate that the act of disclosing such information from millions of users without consent infringes upon established societal norms and expectations of privacy.[77]

---

[77] Jessica Hagen, *Survey: Privacy protections boost consumers' willingness to share health data*, MOBIHEALTH NEWS (Mar. 7, 21023) https://www.mobihealthnews.com/news/survey-privacy-protections-boost-consumers-willingness-share-health-data (last visited November 6, 2024).

142.    Consumer surveys indicate that consumers are "most willing to share their health information when privacy protections are in place, with consent being the most important, followed by data deletion, regulatory oversight and data transparency."[78]

143.    As an illustration, a recent survey conducted by Consumer Reports indicated that 92% of Americans hold the opinion that websites and internet companies should be obligated to seek consent before selling or sharing consumers' data. Similarly, the same percentage believe that these companies should be mandated to furnish consumers with a comprehensive inventory of the information collected about them.[79] Another study by *Pew Research Center* concluded that approximately 79% of Americans, are concerned about how data is collected about them by companies.[80]

144.    User behavior conforms to these statistics: after the introduction of a new version of the iPhone operating software, which requests explicit and affirmative consent from users before permitting companies to track them, a substantial majority of users who were presented with the prompt opted not to share their data when – worldwide users (85%) and U.S. users (94%).[81]

145.    Heightening the concern associated with the sharing of medical information is exasperated by the reality that advertisers place a high value on this type of information. Allowing advertisers to access women's sexual health information, for example, allows advertisers to obtain information on unborn children. An article addressing this concern stated: "the datafication of

---

[78] *Id.*

[79] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/ (last visited November 6, 2024).

[80] *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER (Nov. 15, 2019) https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/ (last visited November 6, 2024).

[81] Margaret Taylor, *How Apple screwed Facebook*, WIRED (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook (last visited November 6, 2024).

family life can begin from the moment in which a parent thinks about having a baby."[82] The article goes on to emphasize that:

> Children today are the very first generation of citizens to be datafied from before birth, and we cannot foresee — as yet — the social and political consequences of this historical transformation. What is particularly worrying about this process of datafication of children is that companies like . . . Facebook . . . are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles.[83]

146.    Privacy law experts have voiced their concern regarding the sharing of users' sensitive medical information with third parties. Dena Mendelsohn, the prior Senior Policy Counsel at Consumer Reports, and current Director of Health Policy and Data Governance at Elektra Labs, has explained that the dissemination of personal health information without one's awareness could have significant consequences, such as impacting the ability to secure life insurance and influencing the cost of coverage.[84] Additionally, Mendelsohn stated that could lead to higher interest rates on loans and leave individuals more susceptible to workplace discrimination.[85]

147.    Without their knowledge or consent, Defendant has surreptitiously collected and shared Plaintiffs' and Class Members' personal information and personal health information, through Pixel, in violation of their privacy interest.

---

[82] Veronica Barassi, *Tech Companies Are Profiling Us From Before Birth*, THE MIT PRESS READER (Jan. 14, 2023) https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/ (last visited November 6, 2024).
[83] Id.
[84] Donna Rosato, *What Your Period Tracker App Knows About You*, CONSUMER REPORTS (Jan. 28, 2020) https://www.consumerreports.org/health/health-privacy/what-your-period-tracker-app-knows-about-you-a8701683935/ (last visited November 6, 2024).
[85] *Id*.

**H.     The Economic Value of Plaintiffs' and Class Members' Personal Health Information**

148.     Facebook's business is built around collecting personal data. This is unsurprising given that the "world's most valuable resource is no longer oil, but data."[86] As stated in the *Economist*, personal data is "the oil of the digital era."[87]

149.     There is a large economic market for consumers personal data within the tech industry, including the type of data collected from Plaintiffs and Class Members.

150.     A *Financial Times* article published in 2013 reported that the data-broker industry has reaped tremendous profits from trading thousands of details regarding individual's "age, gender and location" information which are sold for about "$0.50 per 1,000 people."[88]

151.     Similarly, *TechCrunch* has reported that "to obtain a list containing the names of individuals suffering from a particular disease," someone within the market would have to spend about "$0.30 per name."[89] That article explained further that the value of a single user's data (in the corporate acquisition context) can range from $15 to $40 per user.[90] The article notes that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[91]

152.     An article published by the Washington Post in 2021 by the legal scholar Dina Srinivasan explained that consumers "should think of Facebook's cost as [their] data, and

---

[86] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data(last visited November 6, 2024). (emphasis added).
[87] *Id.*
[88] Emily Steel, et al., *How much is your personal data worth?*, FINANCIAL TIMES (June 12, 2013), https://ig.ft.com/how-much-is-your-personal-data-worth/#axzz3myQiwm6u (last visited November 6, 2024).
[89] Pauline Glickman and Nicolas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (last visited November 6, 2024).
[90] *Id.*
[91] *Id.*

scrutinize the power it has to set its own price."[92] The value of this information is only increasing. Facebook's financial statements reveal that from 2013 to 2020, the value of the average American's data in the advertising context rose from $19 to $164 per year.[93]

153.    In a paper published in 2013 by the Organization for Economic Cooperation and Development ("OECD"), the OECD measured the prices that were being demanded by companies for user information, similar to that at issue here, derived from "various online data warehouses."[94] The OECD found that, at that time, the following elements of personal data were available for various prices: "USD 0.50 cents for an address, USD 2 [i.e. $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[95]

154.    Importantly, a 2021 report by Invisibly found that personal medical information is one of the most valuable pieces of information within the market for data. The report noted that "[i]t's worth acknowledging that because health care records often feature a more complete collection of the Tracked User's identity, background, and personal identifying information (PII), health care records have proven to be of particular value for data thieves. While a single social security number might go for $0.53, a complete health care record sells for $250 on average. For criminals, the more complete a dataset, the more potential value they can get out of it. As a result, health care breaches increased by 55% in 2020."[96]

---

[92] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited November 6, 2024).
[93] *Id.*
[94] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, NO. 220 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (last visited November 6, 2024).
[95] *Id.* at 25.
[96] *Id.*

155.    This article provided a complete breakdown of the average price per record type:

| Record Type | Average Price |
|---|---|
| Health Care Record | $250.15 |
| Payment Card Details | $5.40 |
| Banking Records | $4.12 |
| Access Credentials | $0.95 |
| Social Security Number | $0.53 |
| Credit Record | $0.31 |
| Basic PII | $0.03 |

156.    Individuals can even choose to monetize their own personal data if they choose to do so.

157.    An article published by the Verge notes that Facebook has offered individuals money for their voice recordings,[97] and has also offered teens and adults up to $20 a month plus referral fees to install software allowing Facebook to collect data on how individuals us their smartphones.[98]

158.    Additionally, various other companies and apps such as Nielsen Data, Killi, DataCoup, and AppOptix offer consumers money in exchange for their personal data.[99]

---

[97] Jay Peters, *Facebook will now pay you for your voice recordings*, THE VERGE (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognitionviewpoints-prounnunciations-app (last visited November 6, 2024).
[98] Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data,* CNBC (Jan. 29. 2019) https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html (last visited November 6, 2024).
[99] *28 Apps That Pay You For Data Collection: Earn a Passive Income,* DOLLAR BREAK (July. 7, 2022), https://www.dollarbreak.com/apps-that-pay-you-for-data-collection/ (last visited November 6, 2024).

I.        **Facebook's Long History of Privacy Violations**

159.    Facebook has maintained its core business model around monetizing user information since 2007 to the expense of its users. This is evident from a complaint filed by the Federal Trade Commission ("FTC") in 2019 against Facebook which noted that ""substantially all of Facebook's $55.8 billion in 2018 revenues came from advertising."[100]

160.    During its launch in 2007, Facebook introduced the "Facebook Beacon" without users being informed about the tracking of their online activities, and initially, there was no option for users to op-out. Following widespread criticism, Facebook Beacon was eventually discontinued.

161.    Facebook reached another settlement with the FTC in November of 2011 related to their sharing of Facebook user information with advertisers. In addition, the settlement covered claims that Facebook had falsely asserted that third-party apps were only able to access data which they needed to operate, when in reality, the third-party apps could access nearly all of Facebook's users' personal data. The Chairman of the FTC, Jon Leibowitz, warned that "Facebook is obligated to keep the promises about privacy that it makes to its hundreds of millions of users . . . Facebook's innovation does not have to come at the expense of consumer privacy."[101]

162.    The 2011 FTC settlement resulted in a Consent Order which prohibited Facebook from misrepresenting the level of control consumer have over their privacy settlings, the necessary actions consumers need to take to exercise those controls, and the extent to which Facebook allows third-parties to access user information.[102]

---

[100] Complaint For Civil Penalties, Injunction, And Other Relief, *United States v. Facebook, Inc.*, Case No. 19-cv-2184-TJK (D.C. July 24, 2019), ECF No. 1.
[101] *Id.*
[102] Fed. Trade Comm'n., *In re Facebook*, Decision and Order, FTC File No. 092 3184 (Jul. 27, 2012)

163.     Another Facebook privacy scandal arose in April of 2015 when a report showed that Facebook could not track how many developers were using previously downloaded Facebook user information.

164.     In 2018, Meta faced scrutiny once more due to its failure to safeguard users' privacy. During congressional hearings, Facebook disclosed that a company named Cambridge Analytica potentially obtained the data of approximately 87 million users in relation to the 2016 presidential election. Consequently, the Federal Trade Commission (FTC) launched another investigation in 2019 to examine Facebook data collection methods and privacy policies. The investigation concluded with a historic settlement of five billion dollars.

165.     Thereafter, an investigation uncovered that Facebook had breached users' privacy consent by granting more than 150 companies access to users' information.[103] As a result, certain companies even had the ability to read users' private messages. Paradoxically, this arrangement assisted Meta in attracting a larger user base.

166.     In June 2020, despite assuring users that app developers would not be able to access their data if they had been inactive for 90 days, Facebook disclosed that it had still allowed third-party developers to retrieve such data.[104] As a consequence of their failure to safeguard user data, thousands of developers were able to view information about inactive Facebook users, provided that those users were connected on Facebook with an active user.

167.     Finally, in June 2022, a settlement was reached between Facebook and the U.S. Department of Justice regarding allegations that the company enabled landlords to engage in discriminatory practices when advertising housing through Meta's ad targeting tool called

---

[103] Elizabeth Schulze, *Facebook let tons of companies get info about you, including Amazon, Netflix, and Microsoft*, CNBC (Dec. 19, 2018), https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html (last visited November 6, 2024).

[104] Kurt Wagner And Bloomberg, *Facebook admits another blunder with user data*, FORTUNE (July 1, 2020), https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/ (last visited November 6, 2024).

"Lookalike Audiences." It was alleged that this tool facilitated targeting users based on sensitive characteristics such as race, gender, religion, and more. As a result of the settlement, Meta agreed to discontinue the use of this discriminatory targeting tool.

168.    In spite of Facebook's long history of grievous privacy violations, Defendant chose to integrate tools created by Facebook, to collect highly sensitive PHI without consent and in disregard to the privacy rights of its users, including Plaintiffs and Class Members.

## TOLLING

169.    The statutes of limitations applicable to Plaintiffs' and the Classes' claims were tolled by Defendant's conduct and Plaintiffs' and Class Members' delayed discovery of their claims.

170.    As alleged above, Plaintiffs and members of the Classes did not know and could not have known when they used the Website that Defendant was disclosing their information and communications to third parties. Plaintiffs and members of the Classes could not have discovered Defendant's unlawful conduct with reasonable diligence.

171.    Defendant secretly incorporated the Pixel into the Website, providing no indication to Tracked Users that their communications would be disclosed to these third parties.

172.    Defendant had exclusive and superior knowledge that the Pixel incorporated on its Website would disclose Tracked Users' protected and private information and confidential communications, yet failed to disclose to Tracked Users that by interacting with the Website that Plaintiffs' and Class Members' PHI, and website interactions would be disclosed to third parties.

173.    Plaintiffs and Members of the Classes could not with due diligence have discovered the full scope of Defendant's conduct because the incorporation of the tracking tools is highly technical and there were no disclosures or other indication that would inform a

reasonable consumer that Defendant was disclosing and allowing the interception of such information to these third parties.

174.    The earliest Plaintiffs and Class Members could have known about Defendant's conduct was in connection with their investigation and the work done on their behalf in preparation of filing of this Complaint.

## CLASS ACTION ALLEGATIONS

175.    Plaintiffs bring this action individually and on behalf of the following Classes:

Nationwide Class: All persons in the United States whose searches and activity on the Website were intercepted, stored, and shared through the use of the tracking tools Pixel (the "Class").

176.    Nebraska Subclass of Tracked Users: All persons residing in Nebraska whose searches and activity on the Website were intercepted, stored, and shared through the use of the tracking tools Pixel (the "Nebraska Class").

177.    Plaintiffs represent, and is a class member of, the Class, consisting of all persons within the United States to whom Defendant provided an electronically printed receipt at the point of sale or transaction, in a transaction occurring nationwide within two years of filing the complaint, and wherein the receipt displayed (a) more than five digits of the person's credit card or debit card number.

178.    Defendant, its employees and agents, and the presiding Judge and associated Court staff are excluded from the Class. Plaintiffs do not know the number of members in The Class, but believes the Class members number in the thousands, if not more.  Thus, this matter should be certified as a Class Action to assist in the expeditious litigation of the matter.

179.    The Class is so numerous that the individual joinder of all of its members is impractical.  While the exact number and identities of The Class members are unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs are

informed and believes and thereon alleges that The Class includes thousands of members. Plaintiffs allege that The Class members may be ascertained by the records maintained by Defendant.

180.    Plaintiffs and members of The Class were harmed by the acts of Defendant in at least the following ways: Defendant illegally printed out sensitive information of Plaintiffs and Class members and disseminated it where it could be easily spotted in disregard of their duty to protect this information.

181.    Common questions of fact and law exist as to all members of The Class which predominate over any questions affecting only individual members of The Class. These common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class members, include, but are not limited to, the following:

a.  Whether Defendant collected Plaintiffs' and Class Members' PHI;

b.  Whether Defendant unlawfully disclosed and continue to disclose the PHI of Tracked Users in violation of the Federal Wiretap Act;

c.  Whether Defendant's disclosures were committed knowingly, willfully or intentionally;

d.  Whether Defendant's disclosures of Plaintiffs' and Class Members' PHI was without consent or authorization;

e.  Whether Facebook collected Plaintiffs' and Class Members' PHI;

f.  Whether Facebook unlawfully intercepts the PHI of Tracked Users in violation of the Federal Wiretap Act; and

g.  Whether Facebook's interception was committed knowingly, willfully, or intentionally.

182.     Information concerning Defendant's data sharing practices, including with respect to the identities of prospective Tracked Users, is available from Defendant's or third-party records.

183.     Plaintiffs will fairly and adequately protect the interests of the members of The Class.  Plaintiffs have retained attorneys experienced in the prosecution of class actions.

184.     Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

185.     The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

186.     Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

187.     Given that Defendant's conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
**Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Nationwide Class)**

188.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 1 through 24 and paragraphs 30 through 168 as though fully set forth herein.

189.     Plaintiffs and Nationwide Class Members maintained a reasonable expectation of privacy in their communications with Defendant via its Website. Medical data is widely recognized by society as sensitive information that cannot be shared with third parties without the

Tracked Users' explicit consent. For example, public polling shows that, "[n]inety-seven percent of Americans believe that doctors, hospitals, labs and health technology systems should not be allowed to share or sell their sensitive health information without consent."105

190.    Plaintiffs' and Nationwide Class Members' reasonable expectation of privacy is supported by HIPAA's recognition that patient medical data is sensitive information that must be protected from unauthorized disclosure.

191.    Plaintiffs and Nationwide Class Members maintained a reasonable expectation of privacy believing that Defendant would not their personal communications with Defendant, as a medical provider, because Defendant were under a duty to not share such information with Facebook unless they had explicit authorization to do so.

192.    Plaintiffs and Nationwide Class Members possessed a reasonable expectation of privacy based on the belief that Defendant would abide by state criminal laws, such as the Federal Wiretap Act ("Wiretap Act") and HIPPA. The Wiretap Act prohibits Defendant from intercepting communications between patients, such as Plaintiffs and the Class, and their healthcare providers without the consent of all parties involved in the communication. Through its placement of Pixel on the Website, Defendant enabled this interception and resulting intrusion upon Plaintiffs' and Nationwide Class Member's privacy.

193.    As explained above, Defendant's actions constitute a serious invasion of privacy that was egregious breach of social norms, such that the breach was highly offensive to a reasonable person because:

    a.    the invasion of privacy occurred in a highly sensitive setting –
          Tracked Users' communications with their healthcare provider;

---

105 *Poll: Huge majorities wants control over health info,* HEALTHCARE FINANCE https://www.healthcarefinancenews.com/news/poll-huge-majorities-want-control-over-health-info (last visited November 6, 2024).

b.    Defendant had no legitimate objective or motive in invading Plaintiffs' and Class Members' privacy in such a manner;

c.    Defendant violated multiple laws by invading Plaintiffs' and Nationwide Class Members' privacy, including the Wiretap Act;

d.    Defendant deprived Plaintiffs and Nationwide Class Members of the ability to control dissemination of their personal medical information; and

e.    Defendant's actions are also unacceptable as a matter of public policy because they undermine the relationship between patients and their healthcare providers.

194.    Defendant's transmission of Plaintiffs' and Nationwide Class Members' communications with Defendant is also so extensive as to constitute oppression, malice, or fraud.

195.    As a direct and proximate result of this infringement upon their privacy, Plaintiffs and Nationwide Class Members sustained harm and experienced various damages. In light of this injury, Plaintiffs and Nationwide Class Members are pursuing suitable remedies, such as compensatory damages, restitution, disgorgement, punitive damages, and any other relief that the Court deems appropriate and fair.

## **COUNT II**
**Violation of the Federal Wiretap Act, U.S.C. § 2510, et. seq.**
**(On Behalf of Plaintiffs and the Nationwide Class)**

196.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 1 through 24 and paragraphs 30 through 166 as though fully set forth herein.

197.    Plaintiffs bring this claim individually and on behalf of the members of the proposed class against Defendant.

198.    Codified under 18 U.S.C. U.S.C. §§ 2510 et seq., the Federal Wiretap Act (the "Wiretap Act") prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

199.    The Wiretap Act confers a civil private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

200.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

201.    The Wiretap Act defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

202.    The Wiretap Act defines "person as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

203.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

204.    Defendant is a person under the Wiretap Act.

205.    The Pixel constitutes a "device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

206.    The confidential communications between Plaintiffs and the Nationwide Class and Defendant's Website, in the form of their PHI were intercepted by Facebook utilizing Pixel, and such communications were "electronic communications" under 18 U.S.C. § 2510(12).

207.    The Wiretap Act is applicable to both the sending and receipt of communications.

208.    Plaintiffs and the Nationwide Class had a reasonable expectation of privacy in their electronic communications with the Defendant's Website in the form of their PHI.

Interception of Plaintiffs' and Nationwide Class Members' communications with the Defendant's Website occurs in the regular course of using the Defendant's Website to search for information related to Plaintiffs' PHI.

209. Defendant violated the Wiretap Act by utilizing the communications that they intercepted to create target audiences and lookalike audiences. 18 U.S.C. § 2511(1)(c)

210. The interception and use Plaintiffs' and Nationwide Class Members' communications with their health care provider, Defendant was intentional and knowing as indicated by: (a) Facebook's terms and guidance for using the Pixel notify website owners that it monitors user activity and shares that info to Meta so it can be paired to their personal FB account; (b) Facebook provides the Business Tools, including the Pixel, for the purpose of making it easier to market to users by tracking their activity and identity; and (c) Facebook has a documented track record of not filtering out supposedly sensitive information..

211. Defendant's interception of these communications occurred contemporaneously with Plaintiffs and Class Members sending and receiving those communications.

212. The intercepted communications, in the form of PHI, between Plaintiffs, the Nationwide Class Members, and the Website constitute the "contents" of the communications for purposes of the Wiretap Act.

213. Defendant did not receive consent from Plaintiffs or the Nationwide Class before it intercepted, disclosed, and used their sensitive PHI with Defendant. Indeed, such consent could not have been given as neither Facebook nor Defendant ever sought any form of consent from Plaintiffs or the Nationwide Class to intercept, record, and disclose their private communications with the Defendant's Website.

214.     As detailed above, Defendant's unauthorized interception, disclosure and use of Plaintiffs' and the Nationwide Class Members' PHI was only possible through Defendant's knowing, willful, or intentional placement of Pixel on the Website. 18 U.S. Code § 2511(1)(a).

215.     Plaintiffs and the Nationwide Class have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications Facebook in violation of 18 U.S.C. § 2520. As such, Plaintiffs and the Class are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Nationwide Class and any profits made by Facebook as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) appropriate equitable or declaratory relief; (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

### COUNT III
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Nationwide Class)**

216.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 1 through 24 and paragraphs 31 through 166 as though fully set forth herein.

217.     Plaintiffs and the Nationwide Class entered into an implied contract with Defendant when they provided their PHI to Defendant in exchange for services, pursuant to which Defendant agreed to safeguard their PHI and not disclose such information without consent.

218.     Plaintiffs and Nationwide Class Members accepted Defendant's offer and provided their PHI to Defendant.

219.     In the absence of an implied contract to not disclose their PHI without consent, Plaintiffs and the Nationwide Class Members would not have entrusted their PHI to Defendant.

220.     Defendant breached its implied contracts by disclosing Plaintiffs' and Nationwide Class Members' PHI to Facebook.

221.    As a direct and proximate result of Defendant's breach of its implied contracts, Plaintiffs and the Nationwide Class have been injured as alleged herein. Had Plaintiffs and Nationwide Class Members known that their private PHI would be disclosed to Facebook, Plaintiffs and Nationwide Class Members would not have used Facebook's services or would have been substantially less for those services.

222.    As such, Plaintiffs and Nationwide Class Members are entitled to nominal, compensatory, and consequential damages as a result of Facebook's breach of implied contract.

## COUNT IV
### Violation of the Nebraska Wiretap Act
### Nebraska Rev. Stat. §86-297
### (On Behalf of Plaintiff Bussard and the Nebraska Class)

223.    Plaintiff Bussard incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 24 and paragraphs 30 through 166 as though fully set forth herein.

224.    Nebraska's Wiretap Act, codified at Neb. Rev. Stat. §§ 86-271 to 86-2,115, prohibits the intentional interception, disclosure, or use of any wire, electronic, or oral communication without the consent of at least one party to the communication.

225.    Nebraska Revised Statutes §86-290(a) provides that it is unlawful to "[i]ntentionally intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept any wire, electronic, or oral communication."

226.    Nebraska Rev. Stat.86-290(b)-(d) makes it unlawful for a person to: "(b) [i]ntentionally use, endeavor to use, or procure any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when (i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication or (ii) such device transmits communications by radio or interferes with the transmission of such communication; (c) Intentionally disclose or endeavor to disclose to any

other person the contents of any wire, electronic, or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic, or oral communication in violation of this subsection; (d) Intentionally use or endeavor to use the contents of any wire, electronic, or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic, or oral communication in violation of this subsection."

227.    Neb. Rev. Stat. §86-297 provides a civil cause of action to "any person whose wire, electronic, or oral communication is intercepted, disclosed, or intentionally used in violation of sections 86-271 to 86-295 and 86-298 to 86-2,103."

228.    Meta violated Neb. Rev. Stat. §86-290(1)(a) through its supplying of the Pixel to Defendant,  effectively procuring Defendant to use of the Pixel to send Plaintiffs' and Nebraska Class Member's PHI to Meta.

229.    Defendant aided Meta in its violation of Neb. Rev. Stat. §86-290(1)(a), by using and procuring Meta, through use of its Pixel, to disclose Plaintiffs and Nebraska Class member's PHI to Meta in violation of Neb. Rev. Stat. §86-290(1)(b).

230.    Defendant and Meta also violated Neb. Rev. Stat  §86-290(1)(d), through its use of the PHI obtained through the Pixel to target Plaintiffs and Nebraska Class members with advertising.

231.    The Act defines "contents" as "any wire, electronic, or oral communication, includes any information concerning the substance, purport, or meaning of such communication." Neb. Rev. Stat. § 86-274

232.    The Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Neb. Rev. Stat. § 86-280

233.    Defendant and Meta are persons pursuant to Neb. Rev. Stat. §86-297.

234.    The Act defines "electronic communication" as " any wire, radio, electromagnetic, photooptical, or photoelectronic facilities for the transmission of electronic communications and any computer facilities or related electronic equipment for the electronic storage of such communication." Neb. Rev. Stat. § 86-278

235.    The Act defines "electronic, mechanical, or other device" as " any device or apparatus which can be used to intercept a wire, electronic, or oral communication." Neb. Rev. Stat. § 86-275.

236.    Plaintiffs and the Nebraska Class had a reasonable expectation of privacy in their electronic communications with Defendant's Website in the form of their PHI. Interception of Plaintiffs' and Nebraska Class Members' communications with Defendant's Website occurs in the regular course of using Defendant's Website to search for information related to Plaintiffs' PHI.

237.    Meta intercepted Plaintiffs' communications with Defendant, in violation of Neb. Rev. Stat. § 86-290(1)(a) via the Pixel on the Website.

238.    Defendant violated Nebraska's Wiretap Act by procuring Meta to intercept Plaintiffs' communications with Defendant, for the purpose of creating target audiences, pursuant to Neb. Rev. Stat. § 86-290(1)(b).

239.    Defendant violated Nebraska's Wiretap Act by using communications intercepted by Meta for the purpose of creating target audiences, pursuant to Neb. Rev. Stat. § 86-290(1)(d).

240.    The interception and use of Plaintiffs' and Nebraska Class Members' communications with their health care provider, was intentional and knowing as indicated by: (a) Facebook's terms and guidance for using the Pixel notify website owners that it monitors user activity and shares that information with Meta so it can be paired to their personal Facebook account; (b) Facebook provides the Business Tools, including the Pixel, for the purpose of making

it easier to market to users by tracking their activity and identity; and (c) Facebook has a documented track record of not filtering out supposedly sensitive information.

241.    Meta's interception of these communications occurred contemporaneously with Plaintiffs and the Nebraska Class Members sending and receiving those communications to and from Defendant.

242.    The intercepted communications, in the form of search terms, search for doctors, and searches for care facilities, between Plaintiff Bussard, the Nebraska Class Members, and the Website constitute the "contents" of the communications for purposes of the Act.

243.    Defendant did not receive consent from Plaintiffs or the Nebraska Class before it intercepted, disclosed, and used their sensitive PHI. Indeed, such consent could not have been given as neither Facebook nor Defendant ever sought any form of consent from Plaintiffs or the Nebraska Class to intercept, record, and disclose their private health communications with Defendant's Website.

244.    As detailed above, Defendant's unauthorized interception, disclosure, and use of Plaintiffs' and the Nebraska Class Members' PHI was only possible through Defendant's knowing, willful, or intentional placement of Pixel on the Website.

245.    Defendant's violations under Neb. Rev. Stat. § 86-290 give rise to Plaintiffs' claims under Neb. Rev. Stat. § 86-297(1), which allows for "[a]ny person whose wire, electronic, or oral communication is intercepted, disclosed, or intentionally used in violation of sections 86-271 to 86-295 . . . [to] recover from the person or entity which engaged in that violation . . . ."

246.    Plaintiffs and the Nebraska Class have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications by Facebook in violation of Neb. Rev. Stat. § 86-297. As such, Plaintiffs and the Class are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages

suffered by Plaintiffs and the Nebraska Class and any profits made by Facebook as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (2) appropriate equitable or declaratory relief; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of their respective classes and their counsel as Class Counsel;

(b)    For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Pixel from the Website or (ii) add, and obtain, the appropriate consent from Tracked Users;

(e)    For damages in amounts to be determined by the Court and/or jury;

(f)    An award of statutory damages or penalties to the extent available;

(g)    For pre-judgment interest on all amounts awarded;

(h)    For an order of restitution and all other forms of monetary relief;

(i)    An award of all reasonable attorneys' fees and costs; and

(j)    Such other and further relief as the Court deems necessary and appropriate.

## JURY DEMAND; TRIAL LOCATION

Plaintiffs demand trial by jury.

Plaintiffs designate Lincoln, Nebraska as the place for trial.

Dated: November 22, 2024

> ROBERT BUSSARD and DANIEL GIBSON, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs
>
> By: /s/ Brian E. Jorde
> Brian E. Jorde (NE Bar #23613)
> **DOMINALAW GROUP, PC LLO**
>
> 2425 South 144th Street
> Omaha, NE 68144
> Telephone: (888) 387-4134
> Email: bjorde@dominalaw.com
>
> Mark S. Reich*
> **LEVI & KORSINSKY, LLP**
> 33 Whitehall St., 17th Floor
> New York, NY 10004
> Telephone: (212) 363-7500
> Facsimile: (212) 363-7171
> Email: mreich@zlk.com
>
> *Attorneys for Plaintiffs*
>
> *\*pro hac vice* forthcoming